THE HONORABLE JAMES L. ROBART

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8

9  **VOLVO CONSTRUCTION EQUIPMENT**
    **NORTH AMERICA, LLC**, A DELAWARE
10  LIMITED LIABILITY COMPANY,

11          Plaintiff and Counterclaim-Defendant,          Case No.: 14-cv-00534-JLR

12  vs.

13  **CLYDE/WEST, INC.**, AN OREGON          **CLYDE/WEST INC.'S BRIEF IN**
    CORPORATION,                                              **OPPOSITION TO PLAINTIFF'S**
14                                                                     **MOTION FOR SUMMARY JUDGMENT**

          Defendant and Counterclaim-Plaintiff.          **NOTE FOR MOTION CALENDAR:**
15                                                                     **FRIDAY, NOVEMBER 7, 2014**

16
17
18
19
20
21
22
23
24
25
26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI  53202
(414) 792-9667

# INTRODUCTION

Volvo's preemptive-strike summary judgment arguments write important provisions of its dealership contract with Clyde/West out of existence, and fail to recognize Washington law's express holding that the existence of contractual discretion triggers the duty of good faith and fair dealing. Likewise, Volvo's argument on the federal Automobile Dealer's Day In Court Act claim ignores that the statute applies to "trucks" on its face. Volvo's motion for summary judgment must be denied.

# FACTUAL SUMMARY

## A.      Clyde's Long Roots in the Pacific Northwest.

Clyde/West, Inc. ("Clyde") is a 103-year old business based in Portland with branches in Seattle, Spokane, and Eugene. (McConnell Decl. ¶ 2.) William McConnell assumed control of Clyde in 1972; his son Pat runs it today along with Rick Semke, who has been with the company since 1973. (*Id.*) Pat owns 55 percent of Clyde and the company's 58 employees own the remainder through an Employee Stock Ownership Plan (the "ESOP"). (*Id.*) Clyde formed the ESOP in 1983 in an effort to give back to the people who had made the company a success. (*Id.*) Today Clyde employees—many with more than 30 years' of service to Clyde and including service technicians, parts specialists, and senior managers—have ESOP holdings that form a central part of their retirement savings. (*Id.*)

If Volvo successfully terminates Clyde's Washington dealership, Clyde's "enterprise value" will fall dramatically and Clyde will be forced to terminate employees and shrink operations, assuming it is even able to survive.[1] (McConnell Decl. ¶ 3.) Volvo acknowledges that Clyde's "overall enterprise value would go down." (Clements Dep. 205.) Clyde's higher sales

---

[1] In general terms, "enterprise value" is the "value of the whole business, rather than its pieces." (Clements Dep. 204-205.) In this brief, all deposition transcripts as well as some of the deposition exhibits referenced are appended to the Declaration of Joseph S. Goode. Certain other exhibits are attached to the Declaration of Patrick McConnell.

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

1

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   volume in Washington supports its ability to service Oregon and Idaho, particularly because
2   Clyde does not maintain an Idaho facility and services the Northern Idaho Panhandle through its
3   Spokane branch. (McConnell Decl. ¶ 3.)  Approximately two-thirds of Clyde's revenue comes
4   from the sale and service of Volvo products.  (*Id*.)  Approximately 60 percent of that Volvo
5   revenue is achieved in Washington.  (*Id*.) While Clyde currently sells and services some non-
6   competing products of other manufacturers, those products account for only one-third of Clyde's
7   overall sales.  (*Id*.)

8          **B.     Clyde's Relationship with Volvo and Market Details.**

9          Clyde first became a Volvo dealer on April 22, 2002 when Volvo granted it the exclusive
10   right to sell and service Volvo's General Purpose Production Equipment ("GPPE") in
11   Washington, Oregon, and Northern Idaho.  (McConnell Decl. ¶ 4 and Exh. A.) Volvo needed
12   help in the Pacific Northwest. (McConnell Decl. ¶ 5.) Over the previous decade, two Volvo
13   dealers (Totem Equipment and Construction Machinery, Inc. ("Old CMI")) went out of business
14   and a third (Triad Machinery) was purchased by a rival manufacturer. (McConnell Decl. ¶ 5;
15   Gerondale Dep. 23, 26-28, 35-39, 46; Tuholsky Dep. 106-108.)  The poor performance of these
16   dealers left Volvo behind its competitors, particularly when Old CMI abruptly ceased operations
17   in March 2002. (McConnell Decl. ¶ 5.) Volvo aggressively pursued Clyde and paid it $2 million
18   for Preferred Stock to increase Clyde's capitalization. (*Id*.)

19          The construction equipment market in North America is divided into three segments and
20   Volvo competes in all of them: GPPE; Road Equipment; and Compact Equipment.  (Tuholsky
21   Dep. 49.)  GPPE includes articulated haulers, wheel loaders, and excavators. (*Id*. at 196-197.)
22   Road Equipment includes pavers, asphalt and soil compactors, motor graders, and milling
23   machines. (*Id*. at 226.) Compact Equipment includes small wheel loaders, compact excavators,
24   small backhoe loaders, and skid steer loaders.  (*Id*. at 194-195, 226.) Since the start of their
25   relationship, Clyde has always sold Volvo's GPPE and Compact Equipment, but Volvo's

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                      2
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   lackluster product development efforts in the Compact Equipment line and market saturation by

2   Volvo's competitors have adversely affected Volvo's and Clyde's penetration in that particular

3   market. (McConnell Decl. ¶ 6; Tuholsky Dep. 226-237.)

4        Until Volvo acquired the Road Division of Ingersoll Rand on May 1, 2007, it did not sell

5   Road Equipment. (Tuholsky Dep. 64-65.)   In that transaction, Volvo assumed ownership of

6   numerous Ingersoll Rand "factory stores", which it planned to divest as it integrated the

7   companies. (Tuholsky Dep. 56, 66, 74-76, 119, 221, 227-228.) On June 22, 2007, and without

8   any warning to Clyde, Volvo rebranded the Ingersoll Rand "factory stores" in Spokane and

9   Seattle as Volvo stores and began to compete directly against Clyde in the Compact Equipment

10  market.[2]  (McConnell Decl. ¶ 7; Tuholsky Dep. 68-72.) When Clyde cried foul that day and

11  asked Volvo to explain its decision to rebrand the "factory stores" under Volvo's blue and white

12  logo, Volvo's then President Denny Slagle cavalierly told Clyde: "Hi, Pat, we can talk Monday,

13  **don't let it ruin your weekend**." (McConnell Decl. Exh. E.)  Volvo then threatened to cancel

14  Cylde's dealership agreement unless Clyde relinquished its exclusive rights to sell Volvo's

15  Compact Equipment line in Washington.  (McConnell Decl. Exh. C; Clements Dep. 247-254.)

16       Nationally, Volvo's market share for GPPE has dropped from roughly 14 percent in 2002

17  to somewhat less than 10 percent currently. (McConnell Decl. ¶ 9; Tuholsky Dep. 272-273.)

18  Today its national market share for Road Equipment is approximately 14-15 percent; Volvo's

19  current share of the Compact Equipment market is approximately 1.4 percent. (Tuholsky Dep.

20  272-273.)   Overall, Volvo's North American market share (across all product segments) is

21  between 3.6 and 4.3 percent. (Tuholsky Dep. 272-273; McConnell Decl. Exh. D, pg. 2.)  While

22

---

23  [2] At this juncture, Volvo had not yet awarded the Road Equipment contract to Clyde. (McConnell Decl. ¶ 7.)  Before
this event, Clyde viewed its relationship with Volvo as positive and Clyde intended to ask for the right to sell

24  Volvo's Road Equipment.  (McConnell Decl. ¶ 8.)  Having made significant strides for Volvo in its first five years
of the relationship and believing in its relationship with Volvo, in 2007 Clyde divested itself of a 20-year old dealer

25  relationship with Bomag Compaction Products ("Bomag") because it knew its sale of Bomag's products would
compete with the Road Equipment products Volvo had just acquired from Ingersoll Rand.  (*Id.*)

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

3

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   Volvo considers itself a top tier competitor with the likes of Caterpillar and John Deere, the

2   reality is that Volvo's market share across all segments does not reflect that. (Tuholsky Dep. 192,

3   275-284; McConnell Decl. Exh. D, pg. 2.)

4       Different geographic regions have different market conditions. (Tuholsky Dep. 185-192,

5   240-254, 248-249; Gerondale Dep. 86-89; Clements Dep. 217; McConnell Decl. ¶ 10.) Mining

6   customers often buy different products than forestry customers and Volvo products used for

7   roadbuilding are not necessarily used in mining or forestry. (McConnell Decl. ¶ 10.)  Not all

8   Volvo competitors are active in all the geographic regions of North America.  (*Id*.)  And Volvo

9   does not offer products that some of its competitors do; for example, the forestry industry is a

10  major customer for construction equipment in Clyde's market, but Volvo does not have many

11  forestry products to offer.   (*Id*.; Tuholsky Dep. 248-249.) These and other variables affect

12  whether a particular dealer can achieve market share at or near Volvo's goals. (Tuholsky Dep.

13  240-254, 248-249; Gerondale Dep. 86-89; Clements Dep. 217; McConnell Decl. ¶ 10.) In

14  addition, since Clyde became a Volvo dealer in 2002, there have been significant changes in its

15  competitive landscape, including (i) the entrance of a multitude of new competing

16  manufacturers; (ii) significant product improvements made by Volvo competitors; (iii) the influx

17  of lower cost alternative products in the Pacific Northwest associated with increased

18  commoditization (meaning that there are fewer distinctions between products enabling dealers to

19  close deals because such distinctions are critical when attempting to get the sale); and (iv)

20  changes in the distribution methods of Volvo's competitors. (McConnell Decl. ¶ 10; Tuholsky

21  Dep. 29-32, 192-195, 204, 217, 241-249, 280-281; Gerondale Dep. 83.)

22      Despite such market volatility, Volvo admits that Clyde at least doubled (possibly even

23  tripled) Volvo's market share in the Pacific Northwest between April 2002 and October 2007.

24  (Tuholsky Dep. 108.) Indeed, before Clyde took on Volvo, Clyde had annual revenue of $13.1

25  million. (McConnell Decl. ¶ 11.) After serving nearly a year as a Volvo dealer, Clyde had grown

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                                                4
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

the dealership and achieved revenue of $22.3 million.  (*Id.*)  In 2005, at Volvo's urging, Clyde invested about $2.25 million in a new dealership facility in Seattle to promote the Volvo product line. (*Id.*) By March 31, 2007—just before the economic downturn that hit the construction industry hard—Clyde had annual sales of $50.1 million.  (*Id.*)

While the "Great Recession" hurt Clyde, the company stayed strong enough to survive, while other Volvo dealers in the United States, including Mathews Machinery in California, failed. (McConnell Decl. ¶ 12.)  And despite Volvo's termination efforts, Clyde continues to grow; it had revenue of nearly $40 million for the 2013-14 fiscal year and currently forecasts that it will achieve the highest revenues in its history for 2014-2015.  (*Id.*)  Results like this stem from tremendous customer service; in 2010, Volvo acknowledged Clyde as a "Top 3" dealer in Volvo's customer satisfaction surveys.[3]  (*Id.*)

## C.    Volvo Efforts To Pressure Clyde To Sell.

Despite Clyde's loyalty, dedication, and hard work on Volvo's behalf, Volvo told Clyde in October 2007, to Clyde's surprise, that it did not have enough capital to grow the business and demanded that Clyde sell the dealership. (McConnell Decl. ¶ 14.)  Clyde was very surprised because it had nearly quadrupled in size since taking on Volvo in 2002, had positive cash flow, and was profitable.  (*Id.*)  As instructed, between October 2007 and November 2009, Clyde worked with Volvo's dealers in Alaska (Construction Machinery Industrial, LLC ("New CMI")) and Utah (Arnold Machinery) and two of its customers (Lakeside Industries and Goodfellow Brothers) to explore the possibility of being acquired. (*Id.*; Gerondale Dep. 169-179; Goode Decl. Exhs. F-J.) In the Spring of 2008, Volvo expressed concern that Clyde was not acting fast enough and then threatened in a May 6, 2008 letter to terminate Clyde pursuant to Section 7.1 of

---

[3] Since 2002, Volvo Financial Services-North America ("VFS"), a Volvo affiliate, has also regularly recognized Clyde as one of the top performing dealers in its division in the U.S. market. (McConnell Decl. ¶ 13.)  Clyde is again in the hunt for top honors from VFS this year.  (*Id.*)

Clyde/West Inc.'s Brief in Opposition to
Plaintiff's Motion for Summary Judgment                                    5
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

the dealer agreement if it didn't have a signed purchase agreement within 60 days. (McConnell Decl. Exhs. E-F.) This is typical Volvo: when a dealer fails to sell as instructed, Volvo uses "the power of the Dealer Agreement to get [the dealer] to move."[4]   (Clements Dep. 100.)

### D.   March 12, 2010 Transactions and Clyde's Expectations.

When New CMI ended negotiations on November 3, 2009, Volvo and Clyde began discussions anew.   By November 19, 2009, Volvo's President Göran Lindgren and Mr. McConnell were discussing the failed transaction with New CMI, the possibility of Clyde assuming the Road Equipment contract for the Pacific Northwest, and Clyde's acquisition of the "factory stores."   (McConnell Decl. ¶ 21.) On January 7, 2010, Volvo advised Clyde that it would award the Road Equipment contract to Clyde if Clyde agreed to buy the assets associated with the "factory stores." (*Id*.)  Believing that this was a good faith effort by Volvo to repair the damaged relationship, Clyde pursued discussions with Volvo.  (*Id*.)

On March 12, 2010, Volvo and Clyde closed on three integrated transactions. (McConnell Decl. ¶ 22; Tuholsky Dep. 139-140, 144-145.) First, Volvo renewed Clyde's dealer relationship and had Clyde sign **separate** dealer agreements for the three territories originally covered by one agreement.  (McConnell Decl. Exhs K-M.) Second, Clyde and Volvo executed

---

[4] The most notable effort to sell involved New CMI.  Between approximately March 27, 2009 and November 3, 2009, New CMI, Volvo, and Clyde worked on a transaction whereby New CMI would acquire Clyde, the right to sell Volvo's Road Equipment in the Pacific Northwest, and the "factory stores" that had been competing against Clyde since at least June 22, 2007.  (McConnell Decl. ¶ 15; Gerondale Dep. 169-179; Goode Decl. Exhs. F-J.) Volvo offered New CMI an extensive "support package" worth between $7.4 and $8.5 million, which was designed to allow it to flourish in Clyde's market after the sale. (Gerondale Dep. 207-216, 266-269; Goode Decl. ¶¶ 6-8 and Exhs. F-G.) Although Clyde understood that previous stumbling blocks to concluding a deal with New CMI had been overcome as of October 15, 2009 (McConnell Decl. ¶¶ 15-18 and Exhs. G-I), on November 3, 2009, New CMI advised both Volvo and Clyde that it would not pursue the transaction. (Goode Decl. ¶ 9 and Exh. H; McConnell Decl. ¶ 19 and Exh. J.) While many things assuredly drove New CMI's decision, it blamed Volvo for devaluing the "support package" (on which it had relied to negotiate with Clyde in good faith) and it had concerns with being forced to acquire the troubled "factory store" assets that Volvo insisted New CMI purchase as part of the deal. (Gerondale Dep. 261-266, 272-275; Goode Decl. ¶¶ 10-11 and Exhs. I-J.) At the time, Clyde knew that Volvo was contributing $3 million to New CMI to help with Clyde's acquisition, but did not learn until this litigation that Volvo had agreed to capitalize New CMI's efforts in the Pacific Northwest to the extent now disclosed. (McConnell Decl. ¶ 20.)

Clyde/West Inc.'s Brief in Opposition to
Plaintiff's Motion for Summary Judgment                6
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

an Asset Purchase Agreement (the "APA") governing Clyde's acquisition of the "factory store" assets, which obligated Clyde to pay Volvo approximately $3.24 million.[5]  (McConnell Decl. Exhs. N-O; Clements Dep. 238-241.)   Third, the parties entered into a settlement agreement and mutual release, which Clyde agreed to on the mistaken belief that Volvo intended to act in good faith going forward and would not use Clyde as a market "placeholder" while Volvo waited for its preferred dealer (New CMI) or some other purchaser satisfactory to Volvo stepped up. (McConnell Decl. ¶ 26 and Exh. P.)

Because Clyde knew that Volvo's "factory stores" had not done well selling Road and Compaction Equipment in the Pacific Northwest and due to Volvo's past approach imposing unreasonable market share demands on Clyde, Mr. McConnell, Clyde sought to protect Clyde by specifying in the APA how Volvo would evaluate Clyde's performance when it came to market share. (McConnell Decl. ¶ 27.) After agreeing to an approach for developing market share goals for the GPPE and Road Equipment segments, Volvo and Clyde then agreed as follows in Paragraph 3.18 of the APA:  **"Going forward, the annual increases in share must also be reflective of decisions Volvo makes to participate or not participate in certain market segments."** [6]  (McConnell Decl. Exh. L, § 3.18.) (Emphasis added.)  Volvo had complained to Clyde about its market share in the past, and Clyde had typically responded by, among other things, pointing out that Volvo did not manufacture products to compete with items such as Feller-Bunchers's specialized high-wide forestry carriers and OR-OSHA approved forestry cabs that were important to customers in the timber industry.  (McConnell Decl. ¶ 27.)  This fact (and

---

[5] Volvo also insisted Clyde assume a multi-year lease on a facility that Volvo's Spokane "factory store" had been leasing.  (McConnell Decl. ¶ 28.)

[6] Section 3.18 of the APA also incorporated two business plans—one for Road Equipment and another for GPPE. Volvo and Clyde worked collaboratively on these plans and both signed off on them. (McConnell Decl. ¶ 29.)  The Road Equipment plan specifically acknowledges problems with the "factory stores" in 2009.  (McConnell Decl. Exh. R, Executive Summary Page.)  Clyde took them off Volvo's hands nevertheless believing it had a future with Volvo.

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

7

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1  others like it) left Clyde at a significant competitive disadvantage against manufacturers who

2  could offer such products. (McConnell Decl. ¶ 27.)   Clyde insisted on the final sentence of

3  Section 3.18 to ensure that Volvo's evaluations of Clyde's market share were required to account

4  for Volvo's actual product mix.[7] (*Id.*)

5       Volvo claims in this litigation that it has "good reason" to terminate Clyde, but admits

6  that before sending its termination notice on October 5, 2012 it had performed "no analysis

7  regarding good cause." (Clements Dep. 230.)   As Volvo itself acknowledged, to make a "good

8  cause" termination, it would have to look at Clyde's performance under the standards imposed

9  by the dealer agreement. (Clements Dep. 156-157.)   Nevertheless, Volvo asserts that Clyde's

10  status as an "underperforming dealer" is what "led to the decision to terminate . . . ." (Goode

11  Decl. Exh. K, Interrogatory No. 11.)

12       Volvo claims Clyde breached the following dealer standards:[8]

13  •    Section 3.1: Failure to use best efforts in its market and to engage in
14  regular and frequent solicitation of customers in a systematic and business like
   manner.

15  •    Section 3.2: Inadequate capitalization and failure to maintain sufficient
16  and properly trained personnel.

17  •    Section 3.3: Failure to stock sufficient inventory.

---

[7] Volvo acknowledges that the "specific needs of the customers in the market" are what "drives competition" and openly concedes that Volvo has been "quite [a] fringe player[] in forestry overall." (Tuholsky Dep. 31-32, 248.)  In the words of Volvo's Ron Tuholsky: "There's no defending the fact that this product line isn't enough in breadth or scope to give [Clyde] a competitive advantage in that particular market segment." (Tuholsky Dep. 249.)

[8] Despite being designated as Volvo's corporate designee on the issue of  the "good  cause supporting Volvo's termination of the Washington Agreement" and the "rights and obligations of Clyde and Volvo under the Washington Agreement", Volvo's General Counsel Christopher Clements repeatedly admitted not knowing whether Clyde was in breach of certain of the dealer standards he was questioned about. (Clements Dep. 103-129; Goode Decl. Exh. L.)

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**    8
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

- <u>Section 4.2</u>: Inability to achieve and maintain financial funding for dealership at appropriate levels.

- <u>Sections 6.1 and 6.2</u>: Failure to achieve required market share and order sufficient amount of products from Volvo.[9]

(Clements Dep. 63-65, 103-129, 230-231; Tuholsky Dep. 95-98.)

With respect to the dealer agreement, Volvo admits that a contracting party like Clyde is entitled to the "benefit of the bargain" and that Clyde should see its "reasonable expectations fulfilled" so long as those expectations are "in the contract." (Clements Dep. 103-104.)  To this end, Clyde expected that if it breached Sections 3.1, 3.2, 3.3, 4.2, 6.1, and 6.2 of the agreement (as asserted by Volvo) that Volvo would provide written notice of Clyde's breach and give Clyde a right to cure under Section 22 of the agreement.  (McConnell Decl. ¶ 29.)  Clyde also expected that Volvo would not abuse its right to impose market share standards in a way that violated Volvo's promise in the last sentence of Section 3.18 of the APA.  (*Id*.) Indeed, if Volvo believed that Clyde was falling short under Sections 6.1 and 6.2 (the "market share" and "product inventory" obligations), Clyde expected that Volvo would give Clyde notice and 180 days to cure as required by Section 22.2.  (*Id*.) Similarly, Clyde expected notice and 60 days (or longer) to cure for other curable breaches subject to Section 22.1.  (*Id*.)  Finally, Clyde expected that Volvo would exercise the discretion afforded it under Section 7.1 of the agreement reasonably and not purposefully thwart Clyde's ability to perform under the agreement when Clyde had been given cure rights in the contract to address alleged deficiencies. (*Id*.)

**E.    Volvo's October 5, 2012 Termination And Its Discretion.**

On October 5, 2012 Volvo terminated Clyde's Washington dealership "effective 180 days from the date of this notice or on April 3, 2013 (the 'Termination Date')." (McConnell Decl.

---

[9] Under the dealer agreement, the "quantity of Volvo Machines ordered and paid for by the Dealer" and the dealer's "market share . . . within the Territory will be **principal factors** in evaluating Dealer's performance." (McConnell Decl. Exh. I, § 6.2; Clements Dep. 220-221; Tuholsky Dep. 96-97) (emphasis added).

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

9

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

Exh. S.) Volvo's termination notice relies exclusively on Section 7.1 of the agreement and provides no basis for termination. (*Id.*; Clements Dep. 62-65, 67-68, 79-80, 101-102, 124-125, 136-139.) Section 7.1 states that the agreement "shall continue for an indefinite period, provided that the Agreement **may** be terminated by either party during such indefinite period upon one hundred and eighty (180) days advance written notice." (McConnell Decl. Exh. K, § 7.1.)  Volvo contends that it does not need cause to terminate Clyde and had "discretion" to terminate under Section 7.1.[10] (Clements Dep. 63, 101-102, 136-139.)  Volvo asserts it had unfettered ability to terminate under Section 7.1 despite the fact that it believed that Clyde was allegedly failing to achieve adequate market share or order sufficient product as required by Sections 6.1 and 6.2 and despite the fact that the dealer agreement contains other sections governing termination. (Clements Dep. 136-139; Complaint, ¶ 15.)

Volvo so far has identified seven dealer transitions (in addition to Clyde) in its North American dealer network dating to 2007.[11]  (Clements Dep. 19-23, 85-86.)   Of those seven, Volvo issued termination letters to two of them (Cantwell and Sweeney) and the other changes were allegedly facilitated as negotiations or directives by Volvo to sell the dealership. (*Id.*) While Clyde has not yet determined what provision of the dealer agreement Volvo used to

---

[10] Notwithstanding the absence of any asserted reason for the termination, Mr. Clements later stated in a June 5, 2013 letter to Clyde that Volvo "does not terminate reasonably performing dealers . . . . Clyde/West has simply been an under-performing dealer for years compared to Volvo dealers in **similar market territories**, which left Volvo no choice but to replace Clyde/West in the Washington territory." (McConnell Decl. Exh. T; Clements Dep. 198-224.) In his recent deposition, Mr. Clements provided no economic or other factual basis for his assertion that Clyde had underperformed for years compared to Volvo dealers in "similar market territories" and, in fact, could not identify any such "territories." (Clements Dep. 198-224.)  This is so even though he was designated to testify about all such facts pursuant to Topic Nos. 9-10 of Clyde's Rule 30(b)(6) Notice. (Goode Decl. ¶ 2 and Exh. L.)

[11] It's unclear if Clyde has all the facts as to how Volvo has used Section 7.1 in the past.  For example, Mr. Clements did not know about a change in ownership of a Volvo territory run by Spreitzer, Inc., which was acquired on or about March 9, 2007 by a joint venture known as Scott Van Keppel, LLC. (Clements Dep. 21-22, 85; McConnell Decl. ¶ 31.) Clyde is continuing to pursue in discovery all facts surrounding each dealership transition in the Volvo network so as to determine whether Volvo has **ever** used any termination provision other than Section 7.1.  Since at least 2002 (if not before), Volvo has used dealer agreements that contain nearly identical provisions to Sections 7.1 and 22 as found in the dealer agreement at issue here.  (Clements Dep. 67-68.)

Clyde/West Inc.'s Brief in Opposition to
Plaintiff's Motion for Summary Judgment                    10
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   terminate the underperforming Sweeney dealership, Volvo used Section 7.1—the provision used

2   in this case—to terminate the underperforming Cantwell dealership.[12] (Clements Dep. 86-87.) In

3   short, of the three actual terminations that Volvo has pursued since 2007 (Cantwell, Sweeney,

4   and Clyde), Volvo relied solely on Section 7.1 to terminate the contract for two of them (despite

5   underlying assertions of underperformance) and Volvo's corporate designee did not know what

6   provision was used in the third. (Clements Dep. 86-88, 100.)   Unsurprisingly, to Volvo's

7   knowledge, it has never "used Section 22.2 of its Dealer Agreement to terminate a dealer."

8   (Clements Dep. 100.)

## ARGUMENT

## I.   THE DEALER AGREEMENT IMPOSES A DUTY OF GOOD FAITH AND FAIR DEALING ON VOLVO.

Contrary to Volvo's assertions in its brief, Clyde's claim for breach of the covenant of good faith and fair dealing does not seek to impose a "free-floating" obligation on Volvo that is not present in the written agreement. (Volvo Brf. 23.)  Indeed, Volvo's brief on the good faith claim does not discuss the express contract provision that actually forms the basis for Clyde's claim – Section 22.2 (and, by extension, Section 22.1), which require both notice of a performance deficiency and an opportunity to cure it – until the penultimate paragraph of its argument on the good faith issue.  Even then Volvo's discussion is cursory, consisting of a couple sentences.  (*Id.*)

Volvo's brief presents a caricature of Clyde's real argument; it neatly sets up and knocks down a series of straw men without ever confronting the substance of Clyde's position.  Here are the key factual premises of Clyde's argument:

---

[12] Despite being designated to testify about the topic, Mr. Clements claimed to be unaware of what provision of the dealer agreement was used.  (Clements Dep. 90; Goode Decl. Exh. L, Topic No. 20.)

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                    11
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1. Volvo admits that the reason for its attempt to terminate Clyde was what Volvo believed to be inadequate performance on Clyde's part.  (Clements Dep. 136-139; Complaint, ¶ 14-15; *supra*, pgs. 1-11.)

2. The dealer agreement contains three potentially applicable provisions, Section 7.1 (which allows for termination without cause on 180 days' notice), Section 22.1 (which relates to non-performance unrelated to Section 6's market share and inventory purchase requirements and provides for termination on 60 days' notice (or longer) if the dealer fails to cure, and Section 22.2 (which governs termination for failure to meet sales goals or achieve market share, and allows termination on 180 days' notice if the dealer fails to cure the deficiencies that Volvo specifies in the termination notice).

3. Volvo admits that it chose to proceed under Section 7.1, because it wanted to sidestep altogether a dispute about good cause, although it claims that if it had wanted to, it could have invoked Section 22 as a basis for terminating Clyde. (Clements Dep. 139; Complaint ¶ 15, *supra*, pgs. 1-11.)

Volvo's argument starts – and stops – with Section 7.1.  Because Section 7.1 does not itself contain any conditions or restrictions on the right to terminate, save the 180 days' notice, Volvo concludes that it had an absolute right to invoke Section 7.1, and thus it can owe no "duties" to Clyde, of good faith or otherwise, that restrain its exercise of that right.  (Volvo Brf. 23.)  In other words: "Do not pass Go, do not consider any other provisions of the agreement. Game over."

As discussed below, this extreme position is fundamentally inconsistent with Washington's rule that the duty of good faith and fair dealing applies to "the performance of specific terms in the contract."  *Rekhter v. State*, 180 Wn.2d 102, 323 P.3d 1036, 1044 (2014). Volvo fundamentally distorts the case law when it suggests that the duty of good faith "only

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                     12
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

attaches to a party's **obligations** under a contract, not to a contractual **right**." (Volvo Brf. 19)(emphasis added). Instead, what the case law states is that the duty of good faith "exists only **in relation to performance of [] specific contract term[s],"** regardless of whether they are characterized as "rights" or "obligations." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 570, 807 P.2d 356, 360 (1991)(emphasis added). In other words, there cannot be a duty of good faith that is "unattached to the underlying legal document." *Id.*

The case law does **not** distinguish between contract terms that are "rights" versus contract terms that are "obligations." Clyde does not argue that the duty of good faith imposes requirements independent of the contract's terms. Indeed, not even Volvo would try to argue that Sections 22.1 and 22.2 fail to qualify as "specific terms" in its agreement with Clyde. Yet that is precisely the practical effect of Volvo's position. In addition, Volvo's interpretation runs afoul of Washington's basic rules of contract interpretation.

Under Washington law, "courts favor an interpretation giving effect to all of a contract's provisions over one that renders some language meaningless or ineffective . . . . Similarly, we do not give effect to interpretations that render contract obligations illusory."[13] *Sovran, LLC v. Michelsen Dairy, Inc.*, 146 Wn. App. 1033, 2008 WL 3319816 *5 (Wn. App., Aug. 12, 2008) (citations omitted). Volvo's position is that it allows Volvo to outright ignore the existence of Sections 22.1 and 22.2 in its own dealer agreement.

Sections 22.1 and 22.2, it bears repeating, are express written provisions of the agreement; they are not the product of an effort to "read in" nonexistent contract terms, nor can these sections plausibly be considered mere "free-floating" sources of legal duty untethered to the words Volvo chose when it drafted its dealer contract. Yet if Volvo is right, every time that

---

[13] As Volvo noted in its opening brief, citation to unpublished state court opinions is permissible. *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003). "[W]e may consider unpublished state decisions, even though such opinions have no precedential value." *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                    13
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   it considers terminating a dealer that is not meeting its performance standards, Volvo is

2   absolutely free to pretend that Sections 22.1 and 22.2 do not exist. (Not incidentally, this appears

3   to be Volvo's actual position: its general counsel testified that he could not identify any dealer

4   that Volvo had ever been terminated using Section 22.2. (Clements Dep. 100.)),

5        If Volvo is correct and its rights are absolute, Section 22.2 is illusory and the same is true

6   of Section 22.1. "A contract is illusory when its provisions make performance optional or

7   discretionary." *Cascade Auto Glass v. Progressive Cas. Ins. Co.*, 135 Wn. App. 760, 145 P.3d

8   1253, 1258 (Wn. App. 2006). Maybe Volvo wrote these provisions into its standard-form dealer

9   agreement to lure overly trusting potential dealers into signing on, under the misimpression that

10  if Volvo believed their performance faltered they would be given notice of their deficiencies and

11  an opportunity to cure. It is an interesting question, but under the current claims asserted by

12  Clyde in its Counterclaim we need not posit such opportunistic motives on Volvo's part.

13        It is black-letter law that illusory contracts are usually unenforceable. *See Seiler v. Black*,

14  153 Wn. App. 1023, 2009 WL 4349306 *3 (Wn. App., Dec. 3, 2009). However, there are

15  exceptions to this general rule. Although Clyde found no Washington cases addressing this issue,

16  other jurisdictions hold that "a court will not find a contract to be illusory if the implied covenant

17  of good faith and fair dealing can be read to impose an obligation on each party . . . . The

18  covenant of good faith 'finds particular application in situations where one party is invested with

19  a discretionary power affecting the rights of another.'" [14] *Chodos v. West Pub Co.*, 292 F.3d 992,

20  997 (9th Cir. 2002). In *Chodos*, the Ninth Circuit ruled that a publisher's agreement giving it

21  "the right in its discretion" to terminate its relationship with an author was limited by the duty of

22  good faith and fair dealing. *Id*.

23

24  _____

25  [14] *Chodos* is a Ninth Circuit case applying California law; Clyde notes that Volvo also cites a Ninth Circuit case
    applying California law in its brief. (Volvo Brf. 22 n.11.)

26

**Clyde/West Inc.'s Brief in Opposition to**                                    Joseph S. Goode
**Plaintiff's Motion for Summary Judgment**                14            Mark M. Leitner
Case No. 14-cv-00534-JLR                                                          Jessica L. Farley
                                                              Pia Anderson Dorius Reynard & Moss
                                                                        400 N. Broadway, Suite 303
                                                                              Milwaukee, WI 53202
                                                                                 (414) 792-9667

1   Other cases have reached the same result, demonstrating that here, the law reflects

2   common sense:   a contract that can be either invoked or ignored at the unrestrained whim of one

3   party is no contract at all, and courts avoid that inefficient result by limiting discretion through

4   the application of the duty of good faith and fair dealing.  For example, in *Sadowski v. Dell*

5   *Computer Corp.*, 268 F. Supp. 2d 129 (D. Conn. 2003), an employee sued to obtain disability

6   benefits under an incentive agreement that gave her employer, in its words, "sole and exclusive"

7   discretion to decide whether her termination had been effected because of a permanent disability.

8   The court rejected the employer's argument that the lack of any express restrictions on its

9   decision-making rights in the disability provision gave it literally limitless power:

> If Dell is correct that the discretion granted to it under the contract to designate the reason for Sadowski's termination is absolute, limitless and creates no obligation to Sadowski, then the provision for early vesting in the event of a discharge due to a disability has no meaning. Whether the stock options vested under the Incentive Agreement would not actually bear any relation to whether the employee's termination was actually due to a disability, as contemplated by the plain language of the contract.

13  268 F. Supp. 2d at 136.  In order to avoid an illusory promise, the court imposed a duty of good

14  faith that limited the employer's asserted "absolute" discretion.  *Id*. at 136-37.

15      Likewise, in *Padberg v. Dish Network*, LLC, 2012 WL 2120765 *3-*4 (W.D. Mo., June

16  11, 2012), the defendant argued that it had not breached its agreement for satellite television

17  services with the plaintiff because the agreement gave it the absolute discretion to change

18  plaintiff's programming at any time.  The court rejected the defense and held that "[b]ecause the

19  contract grants Dish Network the discretion to change Padberg's programming, Dish Network's

20  programming decisions are therefore subject to an implied duty of good faith and fair dealing,

21  and a requirement that Dish Network exercise its discretion reasonably."  *Id*. at *3.

22      Volvo's responses to this line of argument are predictable. It will likely deny that it

23  exercised discretion at all, and claim that it simply asserted an unqualified right to terminate

24  without cause.   (Clements Dep. 137; *see also* Volvo Brf. 23.)   This is pure semantic

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**          15
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1  gamesmanship.  Volvo attempts to make an artificial distinction between a contractual right and

2  a contractual obligation.  It uses this distinction to avoid acknowledging the legal concept of

3  "discretion" because under Washington law, "when the manner of performance under a specific

4  contract term allows for discretion on the part of either party," the duty of good faith is triggered.

5  *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628, 632 (Wn. App.

6  1997)(*quoting Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)).  Volvo's brief attempts

7  to disclaim that it possessed, let alone exercised discretion; however, this does not override its

8  express testimonial admission that it **had** discretion to invoke Section 7.1. (Clements Dep. 102.)

9  Volvo even explicitly concedes that it had the option to choose either Section 7.1 or Section 22.2

10  as grounds for terminating Clyde if the facts supported a Section 22.2 termination.  (Clements

11  Dep. 139.)  "Options" and "choices," of course, are just synonyms for "discretion."  *Cf. Cotton*

12  *v Weyerhaeuser Timber Co.*, 20 Wn.2d 300, 147 P.2d 299, 308 (1944) (discretion "means the

13  power of free decision, individual judgment, undirected choice") (Grady, J., dissenting).

14        Indeed, the concept of good faith as a restriction on purportedly unlimited contractual

15  discretion is itself an essential principle of contract interpretation.  Earlier this year, the Supreme

16  Court of Washington cited with approval the Ninth Circuit's application of Washington good

17  faith law in *Scribner v. Worldcom, Inc.,* 249 F.3d 902, 910 (9th Cir. 2001):  "Good faith limits

18  the authority of a party retaining discretion to interpret contract terms; it does not provide a blank

19  check for that party to define terms however it chooses."  *Rekhter*, 323 P.3d at 1041.  Contrary

20  to this principle, Volvo seeks not so much a blank check as a knife that will allow it to excise

21  Sections 22.1 and 22.2 from the dealer agreement altogether.

22        Volvo also likely will contend that Clyde's argument ignores what Volvo sees as an

23  inviolable distinction between contract "rights," which in Volvo's view always trump the duty of

24  good faith and fair dealing, and contract "obligations," which alone give rise to the duty.  (Volvo

25  Brf. 19.) Volvo's interpretation of its cases is unpersuasive.   First, Volvo's position ignores the

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

16

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

dispositive role of discretion in triggering the duty of good faith. Indeed, none of Volvo's cases deal with a party's choice—as here—between two contract termination provisions, each arguably fully applicable to the facts. By itself, Volvo's cases are distinguishable on the basis that they do not involve a party's choice between **two** provisions **in the contract itself**.

Second, Washington precedent extends the good faith duty to "the performance of **specific terms of the contract**." *Rekhter*, 323 P.3d at 1044 (emphasis added); *see also Goodyear*, 935 P.2d at 632 ("manner of performance under a specific contract term" triggers duty of good faith); *Keystone Land & Development Co. v. Xerox Corp.*, 152 Wn.2d 171, 94 P.3d 945, 949 (2004) (good faith duty "exists only 'in relation to performance of a specific contract term'") (citation omitted). These cases do not recognize Volvo's fanciful distinction between unlimited "rights" and duty-bound "obligations." Instead, they hold that the duty of good faith is implicated by a party's performance under a specific, identifiable provision in the agreement. After all, Volvo acknowledges that Clyde is entitled to the benefit of the bargain it negotiated and that Clyde's reasonable expectations must be fulfilled so long as those expectations are drawn from the contractual language itself. (Clements Dep. 103-104.)

Moreover, Volvo's focus on what it defines as contract "rights" is contrary to the Washington Supreme Court's holding in *Rehkter* that a defendant can violate the duty of good faith and fair dealing even though it has not breached an express contract term. 323 P.3d at 1041. The *Rehkter* court quoted with approval the Seventh Circuit's holding in *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 766 (7th Cir. 2010) that "[i]t is, of course, possible to breach the implied duty of good faith even while fulfilling all of the terms of the written contract." *Id*. Other jurisdictions that hold that the duty of good faith can be violated even when a written agreement is never breached have concluded that "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations **even when it exercises an express and unconditional right** to terminate." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J.

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                    17
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1   396, 422, 690 A.2d 575 (1997) (emphasis added).  The rule in *Sons of Thunder* is consistent with

2   the Washington Supreme Court's refusal in *Rehkter* to limit actions for breach of the duty of

3   good faith to those where the plaintiff alleges that the defendant actually breached a provision of

4   the agreement.

5         Here Clyde argues that Volvo's choice not to proceed under Section 22 so as to avoid a

6   dispute over good cause (Complaint, ¶ 15) was tainted by bad faith.  The Court need only read

7   the record developed thus far to see that there is a factual dispute regarding Volvo's assertions of

8   underperformance and whether it even has good cause to terminate Clyde's dealership. Given the

9   existence of Volvo's discretion and the fact that even Volvo concedes it could have invoked

10  competing contract provisions to initiate a termination under Section 22.2 (and, by extension,

11  Section 22.1), the duty of good faith and fair dealing is triggered.

12        Volvo argues that Clyde's interpretation of the agreement would "re-write section 7.1 to

13  be available only to terminate well performing dealers (a nonsensical result)[.]"  (Volvo Brf. 23.)

14  Not so.  There are likely good uses for Section 7.1.  For example, Volvo can freely use Section

15  7.1 to terminate its dealer agreements if it decided to withdraw altogether from all or part of the

16  North American market.  *Cf. St. Joseph Equipment v. Massey-Ferguson, Inc*., 546 F.Supp. 1245

17  (W.D. Wis. 1982) (manufacturer's withdrawal from marketing farm machinery was not a breach

18  dealership contract).  It could similarly rely on Section 7.1 to effect termination of a dealership

19  that was acquired by a competitor like Caterpillar or Deere who intended to keep marketing its

20  own products through existing outlets.  *Cf. Dover Elevator Systems, Inc. v. Northwestern*

21  *Elevator Co*., Case No. 98-C-932 (E.D. Wis., filed September 18, 1998) (seeking declaratory

22  judgment allowing elevator manufacturer to terminate dealership that had been purchased by its

23  main competitor).  In other words, if Volvo were acquired by a competing manufacturer (or if it

24  acquired a competitor), Section 7.1 could be a vehicle to eliminate duplication in the surviving

25

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**      18
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1  company's dealer network.  Clyde's construction hardly renders Section 7.1 a nullity, but that is
2  what Volvo wants the Court to believe.

3         Finally, Volvo misstates the cases it relies on when it contends that "[l]ike the parties in
4  *GMAC*, *Pearson*, and *Myers*, Volvo was entitled to effectuate termination in more than one way,
5  under more than one section of a contract."  (Volvo Brf. 23.)  Volvo's reliance on *GMAC v.*
6  *Everett Chevrolet, Inc.*, 179 Wn. App. 126, 317 P.3d 1074 (Wn. App. 2014), is doubly
7  misleading in this context, because the case did not concern a contract termination at all; it dealt
8  with a financing company's enforcement of a demand instrument whose express terms allowed it
9  to require immediate payment from the borrower "with or without reason."  317 P.3d at 1084.
10 Not only was *GMAC* a collection case rather than a termination case, in contrast to Clyde's
11 arguments to this Court, the borrower bound by the demand instrument failed to identify any
12 provision of that instrument that gave the financing company discretion or otherwise triggered a
13 duty of good faith and fair dealing.  Absent the required grounding in "performance of a specific
14 contract term," *Keystone*, 94 P.3d at 949, the borrower's good faith argument predictably failed.

15        *Pearson v. Farmers Ins. Co.*, 141 Wn. App. 1011, 2007 WL 3054362 (Wn. App., Oct. 22,
16 2007), unlike *GMAC*, is a termination case.  However, contrary to Volvo's assertion, the *Pearson*
17 defendant's contract with the plaintiff who claimed breach of the good faith duty did not contain
18 multiple provisions **in the contract itself** allowing it "to effectuate termination in more than one
19 way, under more than one section of a contract." (Volvo Brf. 23.)  Instead, Pearson argued that
20 the agreement's "termination review provision," which gave him the right to an internal hearing
21 before a termination review board,  *id*. at *5, gave rise to an "implicit" good cause requirement
22 and implicated the duty of good faith and fair dealing.  The Court of Appeals ruled that "the
23 mere inclusion of a termination review process does not create a good cause requirement," *id*. at
24 *8, and rejected the claim for breach of the duty of good faith.

25

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                                    19
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

Contrary to Volvo's contention, the contract – unlike Volvo's dealer agreement – did not give the employer two different avenues for termination and the discretion to choose between them.  In *Pearson*, unlike the present case, the plaintiff indeed did seek to limit the employer's unequivocal contract right to "require performance of a contract according to its terms." (Volvo Brf. 20) (*quoting Badgett*, 116 Wn.2d at 570).  However, in Clyde's case, there are multiple competing, applicable provisions of the contract and the inevitable choice between them is tempered by the duty of good faith, "according to [their] terms."  *Id.*  Volvo's argument misses the mark.

*Myers v. State*, 218 P.3d 241 (Wn. App. 2009), likewise does not involve a party whose contract provided two different contractual means to achieve termination and unlimited discretion to choose between them.  Myers was an in-home caregiver whose contract with the Washington Department of Social and Health Services provided DSHS could terminate for default upon a finding of neglect that was later substantiated; however, if it was later determined that Myers was not in default, the termination was not rescinded but was "considered a termination for convenience."  218 P.3d at 244.  "The contract grants DSHS broad authority to terminate the contract, regardless of the outcome of the administrative process." *Id.*  In other words, DSHS could terminate the contract, and only the classification of the termination was left unresolved.  The court ruled that  "covenants of good faith and fair dealing do not trump express contract terms or unambiguous rights in a contract." Volvo again mischaracterizes the case it relies on.  The *Myers* contract did not provide DSHS with alternatives that allowed it "to effectuate termination in more than one way, under more than one section of a contract." (Volvo Brf. 23.)  Instead, once the agency acted, termination was a *fait accompli*, but the issue of whether the termination was for neglect or convenience was left undetermined.  This is not the situation under Volvo's dealer agreement with Clyde.

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

20

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

The record compiled to date shows that Volvo, when pursuing terminations of its dealers, evades Section 22 in favor of the easier path found in Section 7.1.  Volvo's efforts to avoid giving Clyde notice and cure rights is an abuse of discretion because the facts show that Volvo believes (wrongly as Clyde will later establish) that Clyde is an underperforming dealer compared to those in similar market territories and Clyde has a right to challenge Volvo's assertion. (McConnell Decl. Exh. T; *supra*, pgs. 1-11.) Clyde's expectation was that Volvo would give it notice and an opportunity to fix the problem period. Clyde also very specifically protected itself in the March 12, 2010 transaction by adding definitive language in Section 3.18 of the APA because it was acutely aware of Volvo's proclivity for unreasonably challenging market share and purchasing quotas.  While no one disputes that Section 7.1 provides Volvo with a right to terminate in appropriate circumstances, that right is constrained wholly and unequivocally by the facts and the rules governing a party's exercise of contractual discretion. Certainly, Clyde never imagined that Section 7.1 would be used to undermine its reasonable expectations of a fair dispute process as called for in Section 22 of the dealer agreement. (McConnell Decl. ¶ 30.)

## II.   CLYDE HAS A VALID CLAIM UNDER THE AUTOMOBILE DEALER'S DAY IN COURT ACT.

Both sides agree that application of the federal Automobile Dealer's Day In Court Act, 15 U.S.C. § 1221 *et seq*., turns on whether Volvo is an "automobile manufacturer" under 15 U.S.C. § 1221(a) and Clyde is an "automobile dealer" under 15 U.S.C. § 1221(c).  Those inquiries, in turn, both depend on whether Volvo makes and Clyde sells "passenger cars, trucks, and station wagons." *Id*.

Volvo thinks the question is easily settled based on its conclusory assertion that "the construction equipment Volvo sells is designed for off-road use for construction projects." (Volvo Brf. 18.)  Volvo ignores its own promotional materials that describe its A35 FS as an

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

21

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1 "articulated **truck**."  (McConnell Decl. Exh. W., emphasis added.)  Likewise, Volvo ignores the

2 web pages showing "Articulated **Truck** Brochures."  (McConnell Decl. Exh. V; emphasis

3 added.) Volvo also fails to account for the Web pages covering the Volvo A35F FS and A40F FS

4 (for "full suspension"), "from the originator of the dumper **truck** hauling concept." (McConnell

5 Decl. Exh. U; emphasis added.)  Finally, Volvo neglects to mention the deposition testimony of

6 its corporate designee, engineer John Bartz, who unequivocally admitted that you can drive

7 Volvo's articulated haulers on roads to get from one construction site to another and can also

8 drive these trucks incidental to other uses.  (Bartz Dep. 27.)  Clyde sells all of these Volvo

9 articulated truck products and should be protected by the statute.  (McConnell Decl. ¶ 36; Gibson

10 Decl. ¶ 7.)

11   Volvo's own words classify these products as articulated **trucks**.  These trucks are further

12 fully capable of carrying passengers on the roads referred to by Mr. Bartz.  (McConnell Decl. ¶

13 36.)  Trucks like these are covered by the federal statute that Volvo seeks to avoid.  The record

14 does not permit summary judgment for Volvo dismissing Clyde's federal claim.

### CONCLUSION

16   Based on the foregoing and all materials of record, Clyde/West, Inc. respectfully requests

17 that Volvo's motion for summary judgment in relation to the claims for Volvo's breach of the

18 implied covenant of good faith and fair dealing and its violation of the federal Automobile

19 Dealer's Day In Court Act be denied.

20   DATED this 31st day of October, 2014.

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

22

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI 53202
(414) 792-9667

1

## PIA ANDERSON DORIUS REYNARD & MOSS

2

3      *s/ Joseph S. Goode*
       _____
       Joseph S. Goode

4      *Pro Hac Vice*
       Mark M. Leitner

5      *Pro Hac Vice*
       Jessica L. Farley

6      *Pro Hac Vice*
       400 North Broadway

7      Suite 303
       Milwaukee, WI  53202

8      Telephone: (414) 792-9667
       Facsimile:  (801) 350-9010

9      jgoode@padrm.com

10     mleitner@padrm.com
       jfarley@padrm.com

11     ***Attorneys for Defendant and Counterclaim-Plaintiff***

12

13     ## WAID LAW FIRM

14

15     Brian J. Waid
       WSBA No. 26038

16     Jessica M. Creager
       WSBA No. 42183

17     Waid Law Firm
       5400 California Ave. SW

18     Suite D
       Seattle, WA  98136

19     (206) 388-1926

20     bjwaid@waidlawoffice.com
       jcreager@waidlawoffice.com

21     ***Attorneys for Defendant and Counterclaim-Plaintiff***

22

23

24

25

26

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                    23
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI  53202
(414) 792-9667

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2014, I caused to be served the foregoing

**CLYDE/WEST INC.'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR**

**SUMMARY JUDGMENT** on the following parties via the CM/ECF system upon the following

individuals and addresses:

Ann M. Maher
WHYTE HIRSCHBOECK DUDEK S.C.
555 E. Wells St.
Suite 1900
Milwaukee, WI 53202-3819
(414) 978-5410
amaher@whdlaw.com

Thomas M. Pyper
Maria C. Rivera-Lupu
Jordan C. Corning
WHYTE HIRSCHBOECK DUDEK S.C.
33 E. Main St.
Suite 300
Madison, WI  53703
(608) 258-7122
tpyper@whdlaw.com
mrivera-lupu@whdlaw.com
jcorning@whdlaw.com

James Phillips
MILLER NASH LLP
601 Union Street
4400 Two Union Square
Seattle, WA 98101-2352
(206) 622-8484
james.phillips@millernash.com

Karthik Nadesan
Nadesan Beck P.C.
8 E. Broadway
Suite 625
Salt Lake City, UT  84111
(801) 363-1140
karthik@nadesanbeck.com

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**                24
Case No. 14-cv-00534-JLR

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI  53202
(414) 792-9667

John P. Mertens
Pia Anderson Dorius Reynard & Moss, LLC
222 S. Main St.
Suite 1830
Salt Lake City, UT  84101
(801) 350-9000
jmertens@padrm.com

William M. Bankston
Bankston Gronning & O'Hara, P.C.
601 W. Fifth Ave.
Suite 900
Anchorage, AK  99501
(907) 276-1711
wbankston@bgolaw.pro

Michael Jungreis
Davis Wright Tremaine, LLP
188 W. Northern Lights Blvd.
Anchorage, AK  99503
(907) 257-5300
michaeljungreis@dwt.com


PIA ANDERSON DORIUS REYNARD & MOSS


/s Joseph S. Goode
_____

**Clyde/West Inc.'s Brief in Opposition to**
**Plaintiff's Motion for Summary Judgment**
Case No. 14-cv-00534-JLR

25

Joseph S. Goode
Mark M. Leitner
Jessica L. Farley
Pia Anderson Dorius Reynard & Moss
400 N. Broadway, Suite 303
Milwaukee, WI  53202
(414) 792-9667