1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

18

19

20

21

22

| | |
|---|---|
| VOLVO CONSTRUCTION EQUIPMENT NORTH AMERICA, LLC, | CASE NO. C14-0534JLR |
| Plaintiff, | ORDER GRANTING PARTIAL SUMMARY JUDGMENT |
| v. | |
| CLYDE/WEST, INC., | |
| Defendant. | |

## I.   INTRODUCTION

This matter comes before the court on Plaintiff Volvo Construction Equipment

North America, LLC's ("Volvo") motion for partial summary judgment.  (*See* Mot. (Dkt.

# 40).)  This case arises from Volvo's termination of its construction equipment dealer,

Defendant Clyde/West, Inc. ("Clyde").  Having considered the submissions of the parties,

the balance of the record, and the relevant law, and no party having requested oral

argument, the court GRANTS Volvo's motion for partial summary judgment.

ORDER- 1

## II.   BACKGROUND

Clyde has been a dealer of Volvo's heavy construction equipment in Washington, Oregon, and Idaho since 2002.[1]  (Gibson Decl. (Dkt. # 41) ¶ 2.)  In general, there are three segments of heavy construction equipment:  general purpose production equipment; road equipment; and compact equipment.  (Tuholsky Dep. 1 (Dkt. # 68-4) 49:16-23.)  Originally, Clyde sold only Volvo's general purpose production and compact equipment; today, it sells all three categories.  (McConnell Decl. (Dkt. # 69) ¶ 6.)  As such, Clyde's inventory includes equipment such as backhoe loaders, excavators, motor graders, pipe layers, and pavers.  (*See* Gibson Decl. ¶ 7.)

Beginning in 2005, Volvo grew increasingly concerned that Clyde's share in the Washington market for construction equipment was inadequate and that Clyde was undercapitalized.  (*See* Volvo 2005 Emails (Dkt. ## 72-1, 72-2); Tuholsky Dep. 2 (Dkt. # 73-1) 62:6-64:10.)  Based on these concerns, in 2007, Volvo asked Clyde to sell its dealership. (McConnell Decl. ¶ 14.)  Clyde contends that this request was unwarranted because it had increased revenues substantially since becoming a Volvo dealer.  (*Id.* ¶ 11.)  Nonetheless, from 2007 through 2009, Clyde engaged in negotiations with various entities, including Volvo's Alaska dealer, to arrange a sale.  (*Id.* ¶ 15; *see also* Resp. at 6.)  Even with Volvo's assistance, however, Clyde was unable to finalize a sale.  (*See* McConnel Decl. ¶¶ 15-20, Exs. G-J (emails between the parties to the negotiation).)

---

[1] The parties' dispute concerns only Clyde's Washington dealerships.  (Resp. (Dkt. # 67) at 2-3.) Clyde continues to operate as a Volvo dealer in Washington pending resolution of the parties' dispute. (*See* Mot. at 4.)

ORDER- 2

1   Accordingly, in 2010, Volvo and Clyde entered into a revised franchise agreement

2   for each of Clyde's Washington, Oregon, and Idaho territories.  (McConnell Decl. ¶ 22.)

3   Overall, this transaction granted Clyde the right to sell road equipment, consummated

4   Clyde's acquisition of certain road equipment assets, and mutually settled and released

5   the parties' claims.  (*Id.* ¶ 22, Ex. N ("Asset Purchase Agreement"), Ex. P (settlement and

6   release of claims).)  Because Volvo had complained about Clyde's market share in the

7   past, Clyde endeavored to insert into the agreements limitations on the way Volvo would

8   impose its market share requirements going forward.  (McConnell Decl. ¶ 22; *see also*

9   Asset Purchase Agreement ¶ 3.18.)

10   The revised Washington agreement ("Agreement") contains a series of termination

11   provisions that are applicable in different situations.  (*See* Agreement (Dkt. # 41-1)

12   ¶¶ 7.1, 22.)  First, Section 7.1 provides that either party may terminate the Agreement

13   with 180 days notice:

14   This Agreement shall become effective on the date first set forth above (the
     Effective Date") and, unless sooner terminated by either party as provided
15   herein, shall continue for an indefinite period, provided that the Agreement
     may be terminated by either party during such indefinite period upon one
16   hundred and eighty (180) days advance written notice.

17   (*Id.* ¶ 7.1.)

18   Next, Section 22 sets forth the parties' options for terminating the Agreement

19   when a breach has occurred.  In general, Section 22.1 provides that, if either party

20   breaches the Agreement, the other party "may" give the breaching party written notice

21   and 60 days to cure, at the end of which time, the non-breaching party may terminate the

22   contract immediately.  (*Id.* ¶ 22.1)  Certain breaches, however, are exempt from Section

1 | 22.1. (*Id.*)  Specifically, Section 22.2 applies when the dealer fails to maintain the market

2 | shares specified in the Agreement.  (*Id.* ¶ 22.2).  Section 22.2 provides in relevant part:

> [B]y giving written notice to Dealer, Volvo may terminate this Agreement should the Dealer (i) fail to achieve and maintain the market shares referred to in Section 6; or (ii) consistently fail to order to stock sufficient inventory to achieve such market shares . . . and the Dealer shall have failed to remedy either default within one hundred eighty (180) days after written notice from Volvo, or a second such default shall have occurred within a one (1) year period.

7 | (*Id.* ¶ 22.2).[2]

8 | In October 2012, Volvo sent Clyde a notice terminating the Agreement pursuant to

9 | Section 7.1.  (Term. Letter (Dkt. # 41-2) ("Pursuant to paragraph 7.1 of the March 12,

10 | 2010 Dealer Agreement . . . you are hereby notified that Volvo is exercising its right to

11 | terminate the Agreement effective 180 days from the date of this notice . . . .").)  The

12 | notice did not specify a reason for the termination.  (*See id.*)

13 | Nonetheless, Clyde argues that Volvo's subjective reason for terminating the

14 | Agreement was that Volvo believed Clyde was underperforming in the marketplace.  (*See*

15 | *generally* Resp.)  Clyde points to a letter it received from Volvo's general counsel in

16 | 2013 that stated "Volvo does not terminate reasonably performing dealers" and

17 | "Clyde/West has simply been an under-performing dealer for years."  (Volvo May 2013

18 | Letter (Dkt. # 69-20).)  In addition, Volvo's corporate designee testified that Clyde had

19 | failed to meet various contractual market performance standards, including, among

20

---

21 | [2] Additionally, Section 22.3 identifies the circumstances in which Volvo may terminate the Agreement immediately, including, for example, a change in the dealer's ownership or the dealer's failure to account to Volvo for the proceeds of a retail sale.  (Agreement ¶ 22.3.)  Finally, Section 22.4 identifies circumstances that result in automatic termination of the Agreement, including, for example, the

22 | institution of bankruptcy proceedings against the dealer.  (*Id.* ¶ 22.4.)

1 || others, the requirement that Clyde maintain adequate capitalization, stock sufficient

2 || inventory, and use best efforts to solicit customers.  (Clemens Dep. (Dkt. # 68-1) at

3 || 105:15-106:25; 113:5-15; 114:22-116:1; *see* Agreement ¶¶ 3.1, 3.2, 3.3.)

4 ||      Despite arguing that it was terminated for underperformance, Clyde insists that it

5 || was not, in fact, underperforming.  (*See generally* Resp.)  Clyde argues that it increased

6 || Volvo's market share in the Pacific Northwest appreciably since 2002.  (*Id.* at 5.)  Clyde

7 || also argues that it was unrealistic for Volvo to demand greater increases because Volvo

8 || does not manufacture the forestry products that are important to customers in the timber

9 || industry, which forms a large part of the Pacific Northwest market for heavy construction

10 || equipment.  (*Id.* at 8-9.)

11 ||      Volvo's position is that Clyde had repeatedly failed to increase its market share

12 || despite Volvo's efforts to help it do so, and that Volvo felt it had given Clyde sufficient

13 || opportunities to cure its non-performance.  (Reply (Dkt. # 70) at 5; *see also* Tuholsky

14 || Dep. at 256:3-257:19.)  Therefore, Volvo did not invoke Section 22.2's option to give

15 || Clyde time to cure its breaches, but instead terminated the Agreement under Section 7.1.

16 || (Reply at 5; *see also* Term. Letter.)

17 ||      After Volvo sent the termination notice, the parties engaged in litigation and

18 || administrative proceedings that proved unsuccessful at resolving their dispute.  (*See*

19 || Goode Decl. (Dkt. # 46).)  In September 2013, Volvo brought this suit requesting a

20 || declaratory judgment that its termination of Clyde's dealership does not violate the

21 || Washington Manufacturers' and Dealers' Franchise Agreements Act, RCW 46.96 *et seq.*,

22 || the Washington Franchise Investment Protection Act, RCW 19.100 *et seq.*, the Federal

ORDER- 5

1   Dealer Suits Against Manufacturers Act ("Federal Dealer Act"), 15 U.S.C. § 1221 *et seq.*,

2   or any covenant of good faith and fair dealing implied by the Agreement.  (*See generally*

3   Compl. (Dkt. # 1).)  Shortly thereafter, Volvo moved for summary judgment on all four

4   claims.  (*See* Mot.)  The court has granted in part Clyde's motion for a continuance

5   pursuant to Federal Rule of Civil Procedure 56(d).  (*See* 10/20/14 Order (Dkt. # 66).)  As

6   a result, at this time, only Volvo's requests for summary judgment on (1) the duty of

7   good faith and fair dealing, and (2) the Federal Dealer Act are before the court.  (*See id.*

8   at 15.)

9                          **III.    ANALYSIS**

10  **A.    Summary Judgment Standard**

11           Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

12  where the moving party demonstrates (1) the absence of a genuine issue of material fact

13  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

14  317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

15  court has already ruled that Volvo's motion for summary judgment on the good faith and

16  Federal Dealer Act claims raises only questions of law, not fact.  (*See* 10/20/14 Order.)

17  As such, the only question before the court is whether Volvo is entitled to judgment as a

18  matter of law.

19  **B.    Duty of Good Faith and Fair Dealing**

20           Clyde contends that, because Volvo subjectively believed that Clyde was an

21  underperforming dealer, the duty of good faith and fair dealing required Volvo to

22  terminate the Agreement under Section 22.2 instead of under Section 7.1.  (*See generally*

1 Resp.)  Volvo responds that the duty of good faith and fair dealing cannot eliminate

2 Section 7.1's express contractual right to terminate with 180 days notice, with or without

3 cause.  (*See generally* Mot.; Reply.)  Volvo is correct.

4       "A duty of good faith and fair dealing is implied in every contract."  *Badgett v.*

5 *Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991); *see also Rekhter v. State, Dep't of Soc.*

6 *& Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014).  This duty obligates the parties to

7 cooperate with each other so that each may obtain the full benefit of performance.

8 *Badgett*, 807 P.2d at 360.  There is, however, no "free-floating" duty of good faith.  *Id.*

9 Instead, "the duty to cooperate exists only in relation to performance of a specific

10 contract term."  *Id.*  In other words, the duty of good faith "requires only that the parties

11 perform in good faith the obligations imposed by their agreement."  *Id.*  The duty of good

12 faith "does not extend to obligate a party to accept a material change in the terms of its

13 contract."  *Id.*  Nor does it "inject substantive terms into the parties' contract."  *Id.*

14       Here, Section 7.1 unequivocally grants both parties the right to terminate the

15 Agreement for any reason, provided they give 180 days written notice.  (Agreement

16 ¶ 7.1)  In contrast, Section 22.2 gives Volvo the option of allowing a dealer in breach of

17 the Agreement's market performance provisions time to cure:  "Volvo *may* terminate this

18 Agreement should the Dealer (i) fail to achieve and maintain the market shares referred to

19 in Section 6 . . . and the Dealer shall have failed to remedy . . . within one hundred eighty

20 (180) days after written notice."  (*Id.* ¶ 22.2 (emphasis added).)  But "[t]he implied duty

21 of good faith is derivative, in that it applies to the performance of specific contract

22 obligations."  *Rekhter*, 323 P.3d at 1041 (quoting *Johnson v. Yousoofian*, 930 P.2d 921,

ORDER- 7

1   925 (Wash. Ct. App. 1996)).  "If there is no contractual duty, there is nothing that must

2   be performed in good faith."  *Id.* (quoting *Johnson*, 930 P.2d at 925).  Because Section

3   7.1 of the Agreement places no restraints on Volvo's ability to terminate with 180 days

4   advance notice and Section 22.2 is optional, Clyde cannot identify a "contractual duty"

5   that Volvo must perform in good faith.  *See, e.g.*, *Johnson*, 930 P.2d at 923-25 (holding

6   that the duty of good faith was not triggered by a lease clause that required a renter to

7   obtain its landlord's permission before assigning the lease because the clause imposed no

8   obligation on the landlord to consent to any assignment).  Because Clyde's assertion of a

9   duty of good faith is not derived from the performance of specific contract obligations, it

10  must fail.  *See Rekhter*, 323 P.3d at 1041.

11        Clyde argues that, because Volvo has "discretion" to choose which termination

12  provision to use, Volvo has a duty to exercise that discretion in good faith.  (*See*

13  *generally* Resp.)  It is true that the "duty of good faith and fair dealing applies when one

14  party has discretionary authority to determine certain terms of the contract, such as

15  quantity, price, or time."  *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d

16  628, 632 (Wash. Ct. App. 1997); *see also Rekhter*, 323 P.3d at 1041.  The duty of good

17  faith, however, will not be implied to "contradict terms or conditions for which a party

18  has bargained."  *Goodyear Tire*, 935 P.2d at 632.  Clyde cites no Washington State case

19  holding that the duty of good faith limits a party's "discretion" to exercise an express

20  contractual right.  (*See generally* Resp.)  Moreover, contrary to Clyde's position, the

21  Washington Supreme Court has held that "[a]s a matter of law, there cannot be a breach

22  of the duty of good faith when a party simply stands on its rights to require performance

ORDER- 8

1   of a contract according to its terms."[3]  *Badgett*, 807 P.2d at 360; *see also GMAC v.*

2   *Everett Chevrolet, Inc.*, 317 P.3d 1074, 1083 (Wash. Ct. App. 2014) (citing *Allied Sheet*

3   *Metal Fabricators v. Peoples Nat'l Bank of Wash.*, 518 P.2d 734, 738 (Wash. 1974))

4   (holding that the duty of good faith did not limit a lender's ability to demand payment

5   because the written instrument at issue gave the lender the right to demand payment at

6   any time, for any reason or no reason, and the duty of good faith could not contravene the

7   parties' bargained-for terms).

8         Here, requiring Volvo to follow the termination procedures in Section 22.2

9   whenever Volvo subjectively believes a dealer is underperforming would contradict

10  Section 7.1, which gives Volvo the right to terminate for any reason on 180 days notice.

11  Under *Badgett*, there cannot be a breach of the duty of good faith merely because Volvo

12  stands on its rights to terminate the Agreement pursuant to Section 7.1.  *See Badgett*, 807

13  P.2d at 360.

14        Finally, Clyde's contention that various termination provisions render the contract

15  "illusory" is unavailing.  (*See* Resp. at 15.)  To the extent Clyde argues that Section 7.1

16  renders the entire contract illusory, Clyde is incorrect.  Termination provisions do not

17  render a contract illusory where the option to terminate can be exercised only upon the

18

19        [3] Furthermore, although the parties have not cited, and the court is not aware of, any Washington
    State cases addressing the issue, courts in other jurisdictions have held that the implied duty of good faith
    does not limit express termination provisions.  *See, e.g.*, *Triangle Min. Co. v. Stauffer Chem. Co.*, 753
20  F.2d 734, 741 (9th Cir. 1985) (holding that Idaho law would not impose a good faith limitation on a
    provision that allowed either party to terminate the contract at will on 90 days notice); *Taylor Equip., Inc.*
21  *v. John Deere Co.*, 98 F.3d 1028, 1032 (8th Cir. 1996) (collecting cases holding that "the implied
    covenant may not be applied to limit a clear contractual provision allowing termination of the contract
    without cause"); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir. 1979) (holding
22  that the implied good faith obligation did not override an express termination clause).

ORDER- 9

1  occurrence of specified conditions, such as providing notice.  *See Omni Grp., Inc. v.*

2  *Seattle-First Nat. Bank*, 645 P.2d 727, 731 (Wash. Ct. App. 1982); *Alaska Airlines, Inc.*

3  *v. Carey*, No. C07-5711 RBL, 2008 WL 1767720, at *1-2 (W.D. Wash. Apr. 15, 2008)

4  (finding that a 180-day termination notice provision did not make the contract illusory).

5      To the extent Clyde argues that Section 7.1 renders Section 22.2 illusory and

6  therefore the Agreement is unenforceable absent the implication of a duty of good faith,

7  Clyde's argument finds no support in Washington State precedent.  "A supposed promise

8  is illusory when its provisions make its performance optional or discretionary on the part

9  of the claimed promisor."  *Metro. Park Dist. of Tacoma v. Griffith*, 723 P.2d 1093, 1099

10  (Wash. 1986).  But Section 22.2 is not a promise of performance; rather, other sections of

11  the Agreement set forth the affirmative obligations that Volvo promises to perform.  (*See,*

12  *e.g.*, Agreement ¶¶ 3.6, 6.1, 6.2, 13.2, 13.4, 13.10, 14, 17.1, 18.2.)  Sections 22.1 and 22.2

13  merely give both parties the option to try to salvage a breached Agreement by giving the

14  other party 60 days (or, in the case of marketplace underperformance, 180 days) to cure.

15  (*Id.* ¶¶ 22.1, 22.2.)  The fact that Volvo retains the option to allow the dealer to cure a

16  breach of certain contract provisions does not render Volvo's own performance under the

17  contract optional or discretionary.  Against the backdrop of Section 7.1, Clyde may regret

18  that the language of Section 22.2 is not mandatory, that it employs the permissive term

19  "may" rather than the imperative term "shall."  Buyer's remorse, however, is not a

20  justification for the court to re-write the parties' bargained-for terms.  *See GMAC*, 317

21  P.3d at 1084 ("Courts carefully protect the principle of freedom to contract and establish

22  the terms of the contract.").

ORDER- 10

1    Consequently, the court finds that, even if Clyde's underperformance was the

2  subjective reason behind Volvo's termination of the Agreement, Volvo did not have a

3  duty of good faith and fair dealing to terminate the Agreement pursuant to a termination

4  provision other than Section 7.1.

5  **C.      Federal Dealer Suits Against Manufacturers Act**

6    The Federal Dealer Act authorizes an "automobile dealer" to bring suit against an

7  "automobile manufacturer" who, among other things, fails to act in good faith when

8  terminating the dealer's franchise.  *See* 15 U.S.C. § 1222; *see also Sherman v. British*

9  *Leyland Motors, Ltd.*, 601 F.2d 429, 441 (9th Cir. 1979).  The Act defines an "automobile

10  dealer" as a person or business entity "engaged in the sale or distribution of passenger

11  cars, trucks, or station wagons."  15 U.S.C. § 1221(c).  The Act defines an "automobile

12  manufacturer" as any person or business entity "engaged in the manufacturing or

13  assembling of passenger cars, trucks, or station wagons."  *Id.* § 1221(a).  The Act does

14  not further define the terms "passenger cars, trucks, or station wagons."  *See generally id.*

15  § 1221.

16    Federal courts, however, have consistently construed these terms to

17  "exclude . . . arguably similar vehicles," including, for example, mobile homes,

18  snowmobiles, and motorcycles.  *River Oaks Motor Homes, Inc. v. Winnebago Indus.,*

19  *Inc.*, 371 F. Supp. 137, 140 (S.D. Tex. 1974) (mobile homes); *see also Birmingham Small*

20  *Arms Co. v. Brooklyn Cycle, Inc.*, 408 F. Supp. 707, 713 (E.D.N.Y. 1976) (motorcycles);

21  *Varney v. Coleman Co.*, 385 F. Supp. 1337, 1346 (D.N.H. 1974) (snowmobiles).  In

22  doing so, courts have relied on the legislative history of the Act.  Specifically, the original

1   Senate version of the bill covered manufacturers of "passenger cars, trucks, station

2   wagons *and other automotive vehicles*." *See* H. R. Rep. No. 2850, 84th Cong., 2d Sess.

3   (1956) (emphasis added).  The House of Representatives Committee on the Judiciary

4   ("Committee") specifically deleted the words "or other automotive vehicles" from the

5   final version of the bill "in order to limit the bill's coverage to manufacturer-dealer

6   transactions involving the distribution of passenger cars, trucks, and station wagons." *Id.*

7   In the words of the Committee:  "The amendment, therefore, excludes transactions

8   involving buses, tractors, motorcycles, and other transportation vehicles propelled by

9   power." *Id.*  The court finds that heavy construction equipment is more closely

10   analogous to a tractor than to a passenger car or truck.  Accordingly, by legislative intent,

11   heavy construction equipment falls outside the scope of the Federal Dealer Act.

12        Clyde argues that heavy construction equipment should be considered a "truck"

13   under the Federal Dealer Act.  (*See* Resp. 22-23.)  In support of this argument, Clyde

14   points to a Volvo brochure and website that advertise an articulated hauler, a type of

15   construction equipment colloquially known as a "dump truck."  (McConnell Decl. Exs.

16   W, V, U.)  Articulated haulers are one of 13 categories of construction equipment that

17   Volvo sells.  (Reply at 13.)  At one point, both the brochure and website refer to an

18   articulated hauler as an "articulated truck." (McConnell Decl. Exs. W, V, U.)

19        Yet the mere fact that an advertisement includes the word "truck" does not mean

20   that the equipment it describes falls within the Federal Dealer Act's definition of an

21   automobile.  In interpreting a statute, courts "should usually give words their plain,

22   natural, ordinary and commonly understood meanings." *See United States v. Romo-*

1   *Romo*, 246 F.3d 1272, 1275 (9th Cir. 2001). Additionally, the commonsense canon of

2   *noscitur a sociis* "counsels that a word is given more precise content by the neighboring

3   words with which it is associated." *Freeman v. Quicken Loans, Inc.*, ----U.S.----, 132 S.

4   Ct. 2034, 2042 (2012). In the Federal Dealer Act, the word "truck" consistently appears

5   in connection with the words "passenger car" and "station wagon." *See, e.g.*, 15 U.S.C.

6   § 1221 (a), (c). The plain, natural, ordinary, and commonly understood meanings of

7   "passenger car" and "station wagon" refer to vehicles for the transportation of limited

8   numbers of people and small amounts of cargo over established roadways. Under the

9   canon of *noscitur a sociis*, the meaning of the term "truck" in the context of the Act is

10   similarly limited. *See Freeman*, 132 S. Ct. at 2042.

11        Articulated haulers, however, are designed to haul massive amounts of cargo at

12   off-road construction sites, and, as such, do not fall within the Act's definition of a

13   "truck." (*See* Bartz Decl. (Dkt. # 17) ¶ 2.) This conclusion is reinforced by statistics

14   illustrating the differences between articulated haulers and passenger trucks. For

15   example, the length, width, and height measurements of a representative Volvo

16   articulated hauler are approximately twice the respective dimensions of a typical

17   passenger truck. (*Id.* ¶¶ 2-4.) As a result, an articulated hauler exceeds the typical

18   maximum width road allowance under federal regulations for commercial vehicles. (*Id.*

19   ¶ 2.) Additionally, an unloaded articulated hauler weighs 17 times as much as a passenger

20   truck. (*Id.* ¶ 3.) The weight of an unloaded articulated hauler, therefore, exceeds the

21   federal bridge formula maximum by 1.8 times. (*Id.* ¶ 6.) Finally, the price of an

22   articulated hauler is 33 times greater than the price of a passenger truck. (*Id.* ¶ 8.)

ORDER- 13

1   All of these features show that an articulated hauler does not meet the definition of

2   a truck contemplated by the Federal Dealer Act.  The fact that it is possible to drive an

3   articulated hauler on a road from one construction site to another does not place it within

4   the scope of the Act.  After all, mobile homes are meant to be driven on roads from one

5   site to another, but a court nonetheless held that their function and design excluded them

6   from the Act's definition of a passenger truck.  *See River Oaks Motor Homes*, 371 F.

7   Supp. at 139 ("A motor home is a self-propelled vehicle which contains complete living

8   facilities, including kitchen, dining, sleeping and bathroom facilities.  It is designed not

9   only to transport passengers but also to house them on a temporary basis.  No definition

10  of a truck includes a vehicle designed primarily to house and transport human beings,

11  such as a motor home.")  Similarly, the fact that articulated haulers may include a small

12  seat behind the driver seat does not transform them into passenger trucks.  As Clyde

13  concedes, the purpose of this seat is to train new drivers how to operate the vehicle, not to

14  transport passengers.  (*See* McConnell Decl. ¶ 36.)

15  In sum, based on the plain language and legislative history of the Act, the court

16  concludes that Volvo's heavy construction equipment does not come within the scope of

17  the Federal Dealer Act.  Accordingly, Clyde is not an "automobile dealer" entitled to

18  bring suit under the Act, and, at least in the context of the parties' franchise relationship,

19  Volvo is not an "automobile manufacturer" capable of being sued under the Act.  *See* 15

20  U.S.C. §§ 1221, 1222.  Therefore, Clyde's claim necessarily fails, and summary

21  judgment is appropriate.

22

ORDER- 14

1

## IV.    CONCLUSION

2    For the foregoing reasons, the court GRANTS Volvo's motion for partial

3    summary judgment (Dkt. # 40).

4    Dated this 3rd day of December, 2014.

5

6

7    _____

JAMES L. ROBART
8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 15